The first case on the docket is Shipley et al. v. CCN. The parties ready to proceed? Yes, sir. Mr. Burke? Thank you, Your Honors. My name is Richard Burke, and I represent an injector of a class action case. To say the least, it's an unusual role for me. I'm usually on the plaintiff's side of the class action case. And so it's probably some question as to what really brings me here today. This case is extensively briefed. It was argued at great length before our mutual friend, Judge Stack. I believe he got it wrong in a serious way. To some extent, the courts of Illinois have got to decide what is the bottom of the barrel. I'm here to tell you today that this settlement is the bottom of the barrel. At some point, settling a class action case just for the sake of settling is really not what this is ought to be about. If a case is so profoundly flawed that a settlement that is worth next to nothing can be approved, isn't the better course simply to dismiss it? I don't believe this case is profoundly flawed. I don't think it's profoundly flawed at all. Four years ago, we had a case in the federal courts against consensual, which is an affiliate of the parent company of the person. In Pennsylvania, consensual found a plaintiff who had lost his case, called First Orthopedics. Literally lost the case in arbitration. But in order to defeat our case in the federal court in southern Illinois, they went to that plaintiff. And they said, we will give you a nationwide settlement if you file your case in the federal district court in Pennsylvania. And when I was with the Lakeham law firm, we objected to that because we thought it was an outrage. And I still think it is. The court approved that. Federal district court approved that case. And so when this case came along, First Health went fishing. They went fishing for someone who would take that deal. And they found one. They found the plaintiff in this case. There were two cases pending. Roach v. First Health and Coyne-Shipley v. Health. Different circuits, Madison and St. Clair County. In fact, I was up here, First Health tried to file a motion to dismiss my case in St. Clair County. And file a motion to dismiss and stay. The dismissal was based on the fact that we had no contractual claim. We couldn't bring a case. And the stay was because of the case in Madison County. The circuit court in St. Clair County denied the stay. They took it up on appeal. And while all the other business went on, which is the subject of this appeal, on a Rule 23 order, you affirm the circuit court. But they effected a stay anyway. Because they did nothing. Their motion to dismiss was overruled, both on the grounds of the 619, as well as on the grounds of their insufficiency of the pleadings. We had no case in the contract. And they were ordered in February of 2008 to file an answer. Didn't do it. Then the case was on appeal. On December 8th, and you're going to hear all kinds of discussion, there was plenty of it in front of Judge Stack about all of this, who's going behind, who's back, undercut, who. If there was a race to the bottom, they won it. Hardly something to be proud of. No trophies are given for that, except that's what they won. A $600,000, $50,000 trophy for nothing. And wiped out a perfectly legitimate lawsuit. The sole purpose of this settlement was to wipe out the Roach case. On December 8th of 2008, this case was set for class certification in front of Judge Gleason, sitting by designation. Briefs were filed. The case was set October 27th by consent of the defendant, first of all. Filed no brief. Failed to show up for its deposition. Never filed an answer. Never did anything on any responsive pleading whatsoever. Did nothing to prepare for that case, except show up on December 8th and act surprised. Oh, I didn't think we were really going to do this. I thought we were going to argue a stay. And there's a report of proceedings that's filed in this case. I want you to read it carefully. Because what happens in that case is that Judge Gleason says, we are here for a contested class certification. Let's see who's got what. Let's see if this is a legitimate case. But four months before, or five months before, he had certified almost an identical case against a similar, but much, much smaller company. A PPO administrator called Corvell. PLA was denied on that certification. And Corvell, interestingly enough, is announcing it had filed for preliminary approval two weeks ago in a settlement. Perfectly legitimate cases. In the PPO scenario, there are three parties. There's the doctor, who wants patients. And by virtue of getting patients, will reduce his income, reduce his gross revenue, in exchange for value. Just like Walden. But you've got to have the value. There's the network administrator that promises that value. Says, we will sign up insurance companies to have their beneficiaries utilize you if you sign up in our PPO network. And they do sign up. But what does First Health do? First Health doesn't sign up with insurance companies to utilize the doctors. They sign up insurance companies because they are a bill review and auditing company. They like to make themselves out as, oh, well, we're just a network and we never promise anybody anything. The truth of the matter is they sell themselves to the insurance companies to do their bill review work. Every single bill that comes through. Millions and millions of bills. They review them. They say, oh, all we do is make recommendations. The insurance company actually owes the money and the insurance company actually has to pay. Baloney. They get 25% of the cut. Insurance company knocks $1,000 off of a bill. They get $250. Their contracts with those insurance companies require the insurance companies to accept their recommendations at least 95% of the time. That's how they get paid. They don't tell the doctors that. They don't care whether the doctors get patients or not because they just take their tax identification number every time a bill comes through. With that tax identification number, boom, 20% off the top. 20% of gross revenue for healthcare providers in the state of Illinois. Where's the profit margin? You ask any doctor in this state what's happening to him or her and they'll tell you I'm rushing patients through there and making less money. Why? Because PPO networks aren't referring them patients. Now in group health plans where you get a 60-40 or 90-10, you're encouraged to go to those doctors. That's why you look in your book and say I'm going to go to Dr. Smith because I'll have less co-pay and less. But First Health is not satisfied  They also want workers' compensation. You can't refer an employee unless you have a physician's family. Which means every one of those doctors who patients were going to because of their brother-in-law, because of their wife, because of anybody, once that tax identification number, boom, 20%, not 20% off of some high number, 20% below the Illinois workers' compensation is scheduled. That's a huge bite. Auto insurance. You could establish a PPO for auto insurance just to give your auto insurance PPO plans. Nothing illegal about that. They don't do that. So that's the problem. Who do you sue for that loss of the quid pro quo for the PPO? Years ago, when I was with my colleagues in Wood River, we decided to go down two routes. The payor route, just to sue the insurance companies, and the network route, which is to sue the networks. Here's why you need both routes. When you sue the payors, they say, wait a minute, we had a contract. We had a bill review company that sold us this because they were going to save us money on our medical expenses by offering us a PPO network. We're entitled to rely on that contract. We hired them to review the bills because of the network. We're entitled to it. The network says, the first house says we're entitled to it. We didn't promise you anything. We don't owe you any money. We're not reimbursing you. So that's the conundrum you run into. So now let's talk a little bit about what happens on December 8th. We had been approached to take the consensual view. No. They had been approached to take the consensual deal and they took it. And it wasn't even the consensual. So on December 8th, we're set for class certification. Judge Gleason says, I will maintain the status quo. I am appointing the objector, Roach, as class representative and I am appointing their lawyers as class counsel. Judge Gleason says, oh, we want a continuance solely, solely because we want to brief this. We didn't think we were supposed to brief this. And when you read that, those reported proceedings, you will say that they told Judge Gleason over and over and over again that they simply wanted to brief this. It was false. Two days later, they're up in Madison County on a settlement that the court in Madison County said they entered into with the intent to brief Judge Gleason. Now, at some point, honesty to a tribunal is required. I go up to Madison County to fight this. No ex parte's down in front of Judge Gleason. And Judge Stack, you know, you can see from the reported proceedings there, he was a little perturbed at the beginning, feeling as though he had been bushwhacked, so to speak, between two panels. And on his motion denying my request that he should not have involved himself in that fight, there was no reason to do so. Motivations of counsel is a very slippery slope. We are in business. This is our living. I'm not ashamed of being a class action counsel. Now, so what happens? So by clearing these representations to Judge Gleason on December 8th, never telling him that all they had to do is say, Judge, we've already got a settlement. The deal's already cut. Never say anything like that. I will tell you, you're completely misled by that judge who attempted to maintain the status quo. And you can see him toiling with that decision in the reports and proceedings. And he makes a decision and he enters a circuit court order. They take that order up to Judge Stack. Asked him if there was a settlement. They said, do you want me to answer that? He told them, no, I don't think it's appropriate for me to hear that now. Is that a correct representation of that? No. It's not? No, that is completely out of the context of that proceeding. Well, can you put it in context? I certainly can. The court of proceedings is at record C-1001 and goes through to C... This is on C-1436. Well, there must be multiple copies of it. I'm sorry, Judge. This might have been filed multiple times in the record. But I'm looking at the transcript of the December 8th hearing. I can go by transcript page numbers if that's better. Then it's page 24. Okay. All right. I showed page 24 that... Do you want me to answer that? You don't have to. Give me... If you've got... You said it's out of context. I believe it is. Okay. If you look at what happens... Look what happens after that. It says... They go on about this at page 26. Brandon... I'm sorry. I keep mispronouncing his name. First tell us, lawyer. He keeps complaining about not having had time to respond to it. He says, if this case settles, Judge Staff is certainly competent to hear any of these interveners, if they wish to intervene as objectors, if they wish to object. Then he says, we would ask the court to allow us time to answer and respond to the complaint. Allow us time to respond to the class certification motion so that we can argue it intelligently and thoroughly for you, and that as soon as we can. They say that multiple times. Then at the end, if you go further, the court says, well... At page... 33. This is Judge Gleason. In order to try to keep this straight, I've got a court order October 7th that tells me that all pending motions, including plaintiff's motion to leave to amend, defendant's motion to dismiss, defendant's motion to stay, motion to compel, and plaintiff's motion for class certification is set today.  and I guess to enforce it, and the argument is that it would affect the motion for class certification. I think it's kind of unreal, Judge, again, on the next page, I think it's unrealistic to the defendants to a certain extent to think they would have been granted the motion to stay. Then, you go on further. Judge Gleason at 36. I want to accommodate you to allow you to have an appropriate response while at the same time giving some assurances to the plaintiff they are not dealing with reverse auction or having their legs cut out from underneath them. I've got another motion pending. I think it kind of resolves the issue I don't know if I'm on sound footing completely, but it seems to me this particular is a reasonable motion to grant and it's their motion for interim class counsel. All I'm saying did they offer to tell Judge Gleason that there had been an offer in the Madison County case and he did not wish to know that? I think he was just asking whether or not they were engaged in settlement negotiations. That's your interpretation of those lines? Yes. Okay, thank you. I don't believe that well first of all all they had to do was say the case was over. I mean you know Judge Gleason we were under the belief that there was a class certification that was going to be heard in Madison County and a stay or status quo would be maintained on both sides. That's what had happened. And Judge Gleason has got this thing set and from this record you see we could have argued this thing months earlier. And he says and at the end he actually signs the order. And if you look at the order what it says is and there's a handwritten order the same day he says go ahead and sign this order. And he finds that this order this appointment of interim class counsel with all of it's responsibilities which are listed in the handwritten order at record 1058 appointed class counsel so coordinate all federal proceedings on behalf of the class including but not limited to. And then he goes on and lists them. He says at the end this is the handwritten order he even says at the end he finds that the interim appointment order is necessary to protect the interests of the class. It's necessary. Now And are you saying that prevented Judge Stack from proceeding in Madison County Judge Gleason? Well I I think at a minimum at a minimum it required Judge Stack to send the case back well at least to not do it at heart. Is this an accurate quote from Judge Gleason? I'm assuming if they and then get there and certify this before I do I guess that's how it works. Certify Contested certification hearing. That's what first of all that was a nationwide class pending in Madison County. Now again they're slippery here. Okay. The belief was is that there was going to be a contested certification of this case. And the only question is who was going to hear it first. And if Judge Stack had heard the class certification up there and decided he was going to appoint them he could have. But I still believe well let me put it this way. We have an unusual set of circumstances here. To say the least. And I think clearly read this as one he had no authority to do it. Two what you're talking about of course you can walk you can choose whoever you want to negotiate with. And Judge Stack certainly had a case pending in front of him for years. He could have entertained a settlement. Could have. Okay. And that's the essentially the argument that they want to make. Except for a couple of issues. One they're asking this court to adopt the Waverian presumption that I as an objector have to overcome a presumption of reasonableness. And that's what Judge Stack said. Now it seems to me that the existence of a contested court order right or wrong just like in the Kitchell case right or wrong Judge Stack could not simply hold that order to be quote no impact whatever that is. That's perfect. They know who we were. This isn't a case where you go you don't know many of the objectors none of them have been filed. Why is it two days later as an emergency after these defendants told Judge Gleeson that all they wanted to do was prepare their pleadings before we know that we believe there were settlement discussions but nothing had come to fruition as a big difference between talking to people and actually having settled the case even before you said that thing. You'll have time for rebuttal, counsel. Thank you, Judge. Good morning. My name is Eric. I represent the defendant first group and CCM. I've divided my time with the plaintiffs and LA's counsel avoid unnecessary duplication. I only have 10 minutes. I'll be fast. I'll try to focus on I think the arguments that maybe are more unique to the first health side. The contention that was collusion the argument that the objectors case was stronger than the plaintiff's case and that Judge Stack undermined or disregarded an order of another circuit court. In 2009, the parties settled the 2004 case following years of litigation, lengthy negotiation, and mediation.  was very familiar with our case. It had had it for several years. It had also handled several other PPO cases. In the connection with our case, the court received extensive briefs, heard several hearings, circuit court evaluated the process that led to settlement, and the records supporting the settlement, and the court made an intelligent assessment of the strength of the plaintiff's case, and came to the inescapable conclusion that it was a fair and reasonable settlement. As one measure of the reasonableness of the settlement, we provided notice by mail to more than 20,000 health care providers in the state of Illinois, by mail and newspaper and by internet. The health care providers provided notice to our sophisticated businesses, the largest hospitals in the state, health care clinics, doctors, didn't receive a hundred objections, didn't even receive ten objections, received one objection. So in looking at the reasonableness of the settlement, there is an objective measure, these providers who were purportedly being harmed by the way we did business, only one objective, it was the one that had the weakness of their case and the strength of our settlement and also how the St. Clair court came about. In 2004, the plaintiffs commenced this case against First Health. The case was diligently litigated, it was discovery, there were discovery motions. Our case was filed in 2004, that same year and the following year, numerous other cases were filed in this PPL area in Madison County, several before Judge Stack. By agreement with the plaintiffs in those cases, we agreed that the discovery taken of First Health through the third-party mechanism would also constitute discovery in our case so we wouldn't have to keep replicating, producing the same documents twice, the same witnesses multiple times. In 2007, so this is after three years of discovery in our case, there was a split within the plaintiffs council and Mr. Burke left the firm that had been representing the plaintiffs. He filed shortly thereafter an identical case to the one that we had in Madison County. We promptly moved to stay or dismiss the case on the grounds that it was an identical case. We didn't address the merits. It was purely, the motion that was heard was you can't have two cases pending at once. The state was not identical until a class had been certified. That came up here and that ruling was affirmed. At no time did we have any settlement discussions with Mr. Burke. We felt his case was duplicative. It was a narrower class because it was filed two years later. So any settlement, for example, with his case would leave us with a remaining class in the larger case. Leaving that aside, there was no discussion. We moved to dismiss his case at the same time we were litigating with Mr. Schmieder's firm. Come now to 2008, I'm attending a class certification hearing in one of the cases in Madison County. I began speaking with Mr. Schmieder about whether because the case has gotten to a point after four years of discovery where we should make an attempt to settle. He agrees. We begin discussing settlement. Again, absolutely no discussion with the case which at this time  a case of discovery taken in his case. There was no order that we had to answer the complaint because we had a second motion to dismiss. We also have a motion to compel arbitration. So there's no activity going on while the case is on appeal with respect to the St. Clair case. It has stayed by agreement. The terms of the agreement are it's going to stay pending resolution of the appeal which isn't until a year later. Does that agreement appear of record? It is in the record in connection with e-mails that we introduced into the record. It was not entered by the court. It was an agreed statement. It was introduced because it was part of the litigation before Judge Stack, but it was confirmed by an e-mail exchange. And the fact of the matter is there was no discovery. There was no activity in that case. So now in April 2008, Mr. Schmider and I began discussing settlement. It progresses fruitfully. We're making things getting closer. We agree to use an outside mediator. We have that in place. The settlement is complicated. It involves contract amendments. Language had to be negotiated. But the basic guts of the settlement was reached in August 2008. The model for our settlement was a contract settlement. But that settlement, which was approved by the third circuit, had almost all the same terms that our settlement has. Each of the material terms related to PBOs are in our case settlement. In addition, we  have a binding settlement agreement pursuant to a term sheet that is subject to court approval. We didn't think we could take the term sheet into the court. We thought the next step would be the final settlement documentation, make a presentation to the court. That multiple-step  process, from the discussions, the mediation, the signed detail term sheet, I think it was a five-page term sheet, and the final documentation. Along that way, we had kept the settlement confidential, again, still subject to court approval. Despite those efforts to keep it confidential, it appears that word got out about the settlement. In part, one of the things we wanted to do with the settlement was explain the settlement to our payors, first health customers, insurance companies, large health payors, self-insured employers. And we needed to explain what we were doing before we went to court, even though we had a binding agreement. Perhaps as part of that process, word got out of the settlement. At any rate, we heard from Mr. Burke's colleague, Paul Weiss, after we had already had an initial meeting. At the initial meeting, he wanted to include payor counsel, counsel who are in class actions that have been certified in which Mr. Schmieder was counsel of record. We rejected that outright. We never had any discussions with Mr. Weiss. Shortly thereafter, I think by the time our term sheet was signed, he surfaces again saying he's heard scuttled about that there's been a settlement. We would neither confirm nor deny. Again, it was a confidential settlement, still subject to court approval, and we thought it was appropriate just to not have any discussions with him on settlement. We never elicited, I think I believe,   with Mr. Schmieder. What happens is we're working on our settlement discussions. We take the matter quickly before I'll have to leave it to Rob. Thank you. Good morning. May it please the court, I'm Rob Schmieder. I represent the plaintiffs in the class in this matter. I'll just touch on a few basic things that Mr. Brandt from Brenner left out. We negotiated the term sheet on October 15th. At that point in time, the only thing we discussed was class relief. That's how we negotiate. We don't negotiate attorney's fees or incentive awards because we don't want there to be an exclusive settlement. So we didn't negotiate any attorney's fees or incentive awards until after we had that signed term sheet. Then we proceeded from there. What I'd like to do is just remind the court that this is up here and the test is whether or not there is deference that should be afforded to the trial court. But the test before this court here can really be summed up as this. Is this settlement so unfair as to preclude judicial approval? Now, when we settled this case, there was already the consent for settlement out of the federal court that was approved by a federal court judge in the eastern district of Pennsylvania and then affirmed on appeal by a third circuit court of appeals. So I think right off the bat there was an objector. We were one of the objectors. There was the AMA. There were several other objectors that came in. And basically what that court or, unfortunately for us, that court gutted this case and said, your claim is against the payors. It's against the insurance companies. And so when that proceeded through the approval process out there and then through the appellate process, I think that took right around to the end of 2007. Maybe it was early 2008 when we had the final decision. That's when we proceeded with certification against some of the other payors, the insurance companies, and that's when Mr. Branford Brenner and I started discussing ways to explore settlement on this case. So this court would not only have to find that Judge Stacker used his discretion, but in doing so have to basically reach the conclusion that the consensual settlement should have  approved by the federal court and then affirmed by the third circuit. The collusion, I think we've addressed that. There was no collusion here. But when you get to the only other factor that they raised, it's the strength of the case on the merits balance against the settlement. And this is really the one where courts ask is this a good settlement for a bad or risky case or is it a bad settlement for a risky case. And they say that the payors are the ones responsible for making payment. That the payors shall be liable for it. They shall make payment directly. That you have your disputes with the payors. It says that the payors are the ones responsible for making payment. And that's where we stand. That's what the court was looking at. The court examined all of these possible claims that were against First Health. And so what this settlement did was this is concentra plus. We increased payor awareness for four years and adopted the same practices. There's a reporting requirement. There's now transparency. This was significant. Several of our class representatives said if they're going to try to do this, we want them to put it in writing so that we can get out or stay in and know what the terms are and take the silence out of the silence PPO case. There's an early termination provision. Normally they had to give 120 days written notice. We reduced it to 45 days. There were additional disclosures in addition to the website. There's $1.25 million of continuing medical education benefit that would provide free or low-cost CME to the class members. There is no release of the payors. That's exactly like concentra. There hasn't been a release. That's a significant part because we've already had seven PPO settlements against the payors. We've had class members recoup somewhere in the range of $15 to $20 million of these discounts taken back. There's still more payor litigation out there. One of the main arguments is that this is all about making sure that we recover those PPO discounts against first health. The trial court reached the conclusion that no, you don't recover them against the payors. This is a very good settlement for a risky case. To get to the merits of it, the case was first health breached by not requiring the payors to direct the claimants or requiring the payors to direct their insurance or claimants to the providers. After four years of discovery, it was revealed. They do. It's in the payor agreements which were confidential. It took years of fighting with payors and with them to get the claimants to direct the claimants. They filed a case where they cited it to direct. Now, that's the dispute in those other cases. Payors are saying direct doesn't mean financial incentives. That's the common question in those cases. And we'll fight those out with payors. So you ultimately end up with a case against First Health where they're doing precisely what they promised to do. They have contract defenses and the trial court didn't decide the ultimate issues but in the final judgment order in paragraph 11 went through a painstaking analysis of these claims and talked about the significant obstacles the class would need to overcome to recover anything against First Health. That's right there in paragraph 11B. And 11C talks about how the court valued the settlement. That's another issue they raised. They wanted the court to actually do a mathematical formula and lay out, you know, to get the percentage of chance. The percentage of chance we know is zero because the contract says it. But the court was looking at it, here's the actual claims that you have, the contract claims, and what are the damages that can flow from there. And so that's really the issue. I don't hate to interrupt you but this is your opportunity to answer your     couple questions. Please do. So Lauren Schipley came into your office originally and you entered into a contract with them which I assume you did. Did you enter into a contract with them as individuals or as representatives of a class? I wasn't there but I've seen the contract and what the contract provides is that they are going to pursue this case as a potential representative of a class. But it's an individual claim. Until they're appointed a class representative nobody's representing the class. Do you also represent them as individuals? We only represent them as individuals until there's a class certification. And so the real issue on the cross appeal is this. Are we really going to create different standards for class action, ethics? I think when you read all the other opinions out there they say we apply the exact same standards. The critical distinction is once you're appointed class counsel like I was, if the representatives had a dispute with a class member the class member couldn't automatically say well you're representing us and we're adverse to each other. The class member          make the decision on his own. He can't make the decision on his own. He can't make the decision on his own. If there is a conflict why doesn't it have to be redone? Where is he or she at, Roche at? Because every argument Roche wanted to make was made by their counsel. How do we know that? If we're supposed to put in new counsel based on this conflict, why do we envision the exact same argument? Why isn't the proceedings below void like that was argued in the response to your cross-examination? Because I don't think the proceedings would be void. The objection left over may be, but I'm fine with the trial court having to    trial court having  do   case  And I'm not in favor of that case. I'm not in favor of that case. I'm not in favor of that case.     that   and sentence say what you are doing and your case is not in favor of that case. The one objection means nothing. If you look at the General Motors pickup truck case, there was 17 objectors and 17 million class members. The court said, it is very difficult to object. Look at the hurdles I had to go through. It doesn't make any difference. The problem with Judge Statt's order is he shifted the burden over to me to prove collusion instead of them